*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-BG-860

IN RE: OLEKANMA A. EKEKWE-KAUFFMAN, PETITIONER.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 479967)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-228-08)

(Argued June 20, 2018          Decided   June 27, 2019)

*Olekanma A. Ekekwe-Kauffman*, pro se.

*Julia L. Porter*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and EASTERLY, *Associate Judges*.

PER CURIAM: The Board on Professional Responsibility (the Board) recommends that Olekanma Ekekwe-Kauffman be disbarred for violations of the following Rules of Professional Conduct stemming from her representation of a single client: Rule 1.1(a), failure to provide competent representation; Rule 1.1(b), failure to represent client with skill and care commensurate with that generally

afforded by other lawyers; Rule 1.3(a), failure to represent client with diligence and zeal; Rule 1.3(b)(1), failure to seek client's lawful objectives; Rule 1.3(b)(2), intentionally prejudicing client's case; Rules 1.4(a) and 1.4(b), failure to communicate adequately with client; Rule 1.5(a), charging an unreasonable fee; Rules 1.15(a) and 1.15(e), reckless misappropriation of client funds and failure to hold unearned advanced fees in trust; Rule 1.16(d), failure to return unearned legal fees; and Rule 8.4(c), engaging in conduct involving dishonesty, fraud, and misrepresentation. Ms. Ekekwe-Kauffman challenges the Board's Report and Recommendation as to each rule violation found, as well as to the recommended sanction of disbarment. For the reasons explained below, we accept the Board's findings except as to Rule 1.15(a), reckless misappropriation of client funds. Because we conclude the record does not support a finding that Ms. Ekekwe-Kauffman misappropriated funds, we decline to adopt the presumptive penalty of disbarment and instead order a three-year suspension, with reinstatement conditioned upon a showing of fitness.

## I. Background

Ms. Ekekwe-Kauffman was admitted to the District of Columbia Bar in 2002 and has no record of professional discipline. After working for a law firm for a brief period of time, she established a solo practice in Washington, D.C., in 2003

or 2004. This case arose out of her representation of one client, Fremah Manago, in a dispute with the University of the District of Columbia (UDC), where Ms. Manago was a student in the respiratory therapy program. The Hearing Committee heard evidence on the alleged rule violations and made the following factual findings.

## A. The Representation

On May 13, 2005, Ms. Manago retained Ms. Ekekwe-Kauffman to represent her in her dispute with UDC. The form retainer agreement they signed stated that Ms. Ekekwe-Kauffman would represent Ms. Manago in "[e]ducational" matters in the District of Columbia. The agreement set forth five different fee arrangements, including options for a flat fee of $5,000 or an hourly fee of $250 per hour, but it did not specify which one the two had agreed upon for Ms. Manago's case.

Ms. Ekekwe-Kauffman began working on Ms. Manago's case on May 24, 2005. She initially focused her efforts on resolving the case through negotiation and, after about five weeks, she obtained a settlement offer from UDC. Though Ms. Ekekwe-Kauffman advised Ms. Manago to accept UDC's settlement offer, Ms. Manago chose to reject it and proceed with the litigation. Ms. Ekekwe-Kauffman then asked Ms. Manago to write down everything that had happened to her at UDC so that she could prepare to file a lawsuit.

Ms. Ekekwe-Kauffman filed a complaint in Superior Court (Case No. 2005 008186 CAB) on October 12, 2005, naming the District of Columbia, UDC, and three individual UDC employees as defendants—Connie Webster, Janet Akintola, and Susan Lockwood. The complaint contained much of what Ms. Manago had written, without organization or editing for grammatical errors, and, according to Ms. Ekekwe-Kauffman's contemporaneous time records, was filed without any independent factual investigation or legal research. Ms. Ekekwe-Kauffman served only three out of the five defendants: the District of Columbia and two of the UDC employees, Ms. Webster and Ms. Lockwood.

On January 25, 2006, Judge Maurice Ross dismissed the complaint with prejudice as to the District and defendants Webster and Lockwood. Ms. Ekekwe-Kauffman filed a motion for reconsideration, and Judge Ross granted leave to amend the complaint to cure the deficiencies the defendants had identified: that the District was not a proper party to the lawsuit because it did not have control over UDC or its employees under D.C. Code § 38-1202.01(a) (2012 Repl.), and that the complaint failed to state a claim upon which relief could be granted against Ms. Webster and Ms. Lockwood.[1] Ms. Ekekwe-Kauffman then filed an amended

---

[1] The defendants' motion also noted that the Super. Ct. Civ. R. 12(b)(6) argument applied equally to UDC and Akintola, the two defendants who had not been served.

complaint that still contained several of the same problems the original had. The amended complaint again named the District of Columbia as a defendant, along with the same individual defendants, the UDC Board of Trustees, and then-Mayor Anthony Williams. The amended complaint also failed to correct any of the substantive deficiencies identified in the defendants' earlier motion to dismiss. As a result, Judge Ross granted the defendants' motion to dismiss the amended complaint with prejudice as to the District of Columbia and defendants Webster and Lockwood.[2]

Ms. Ekekwe-Kauffman then appealed the decision to this court, which affirmed the dismissal of the case with prejudice on November 1, 2007. *See Manago v. District of Columbia*, 934 A.2d 925 (D.C. 2007). When Ms. Ekekwe-Kauffman notified Ms. Manago of the court's decision, she advised her that she intended to file a new complaint against the UDC Board of Trustees (which had been dismissed from the case *without* prejudice for lack of proper service) and directed Ms. Manago to continue making payments while she worked on the case. Ms. Ekekwe-Kauffman never filed a new complaint, and Ms. Manago discharged

---

[2] Ms. Ekekwe-Kauffman subsequently filed a motion requesting a status hearing, noting that Judge Ross's dismissal order did not apply to the UDC Board of Trustees or defendant Akintola. The court denied the motion and dismissed the case against the remaining defendants on the ground that they had not been properly served.

her as her attorney in March 2008.

The Hearing Committee found that, throughout the representation, Ms. Ekekwe-Kauffman failed to communicate adequately with Ms. Manago regarding the substance of the case. Ms. Ekekwe-Kauffman filed both the complaint and the appellate brief without showing them to Ms. Manago, despite Ms. Manago's request that she do so. Further, though Ms. Manago made several inquiries about the status of her case, Ms. Ekekwe-Kauffman did not send her the trial court's dismissal order or this court's opinion until several weeks after they were issued.

## B. The Payments

At the hearing, Ms. Ekekwe-Kauffman and Ms. Manago expressed different understandings of the billing arrangement for the representation. Ms. Ekekwe-Kauffman testified that they had agreed to a $250 hourly fee, with no cap on the total amount she could charge. Ms. Manago, on the other hand, understood that the agreement provided for a flat fee of $5,000 and that she would make periodic payments of $250 toward that amount.[3] Because the written agreement itself was also ambiguous, the Hearing Committee was unable to determine by clear and convincing evidence which billing arrangement the two had agreed upon.

---

[3] Handwritten notations in the margins of the retainer agreement refer to these periodic payments.

Nevertheless, consistent with her own understanding, Ms. Manago made two $250 payments before Ms. Ekekwe-Kauffman began work on her case—one on May 13, 2005, the date of the agreement, and one on May 23, 2005—and continued to make periodic payments until February 2008. In August 2006, after the trial court had dismissed her case for the second time, Ms. Manago discussed with Ms. Ekekwe-Kauffman her belief that she had overpaid the flat fee by about $3,000 ($8,000 in total). Ms. Manago understood from this conversation that the excess $3,000 would be placed in a trust account to be used toward her appeal and that she would not make any more payments until January, 2007. She resumed making payments in January, 2007, and ultimately paid Ms. Ekekwe-Kauffman a total of $10,800. Although Ms. Ekekwe-Kauffman's invoices reflect that she did no work on Ms. Manago's case after this court's decision in November 2007, she continued accepting Ms. Manago's payments until February 2008.

The Hearing Committee found that regardless of which billing agreement they had agreed upon, there were points at which Ms. Ekekwe-Kauffman accepted more money from Ms. Manago than she had earned. For example, if the retainer agreement called for a $250 hourly fee, she did not earn the first $500 from Ms. Manago—which she received in May 2005—until June 15, 2005, when she had completed two hours of work on the case. If the agreement was for a flat fee, on the other hand, Ms. Ekekwe-Kauffman accepted payments in excess of $5,000

before the trial court proceedings ended. The Hearing Committee found, however, that Ms. Ekekwe-Kauffman never deposited any of Ms. Manago's payments into a trust account, and that she deposited "at least some" of the payments into her business operating account.[4] Ms. Ekekwe-Kauffman admitted as much, but she insisted that she had earned every payment at the time it was made because Ms. Manago was never ahead in her payments.[5]

## C. The Disciplinary Process

Sometime in March 2008, Ms. Manago asked Ms. Ekekwe-Kauffman to refund a portion of her legal fees, but Ms. Ekekwe-Kauffman did not do so. Ms. Manago subsequently filed a disciplinary complaint alleging that Ms. Ekekwe-Kauffman had provided inadequate legal services and had failed to return her money as requested.

In response to an inquiry from Disciplinary Counsel, Ms. Ekekwe-Kauffman attached an invoice addressed to Ms. Manago, dated June 2, 2008, which indicated

---

[4] Though the Hearing Committee found that Ms. Ekekwe-Kauffman deposited four specific $200 payments into her operating account on several occasions during 2007, the report contains no findings relating to what Ms. Ekekwe-Kauffman did with any of Ms. Manago's other payments.

[5] The Hearing Committee rejected this assertion because Ms. Ekekwe-Kauffman's own invoices demonstrated that there were times when Ms. Manago paid more than Ms. Ekekwe-Kauffman had earned.

that Ms. Ekekwe-Kauffman had spent 102.83 hours working on Ms. Manago's case and had earned $25,924.99 in fees and expenses. The June 2, 2008, invoice differed from previous invoices Ms. Ekekwe-Kauffman had provided to Ms. Manago: it included additional time not previously accounted for, and it did not reflect all of the payments Ms. Manago had made. It also incorrectly indicated that Ms. Manago had paid only $7,870, not $10,800. In addition to the invoice, Ms. Ekekwe-Kauffman also submitted two letters she claimed were sent to Ms. Manago regarding her overdue account.[6] Subsequently, in December 2008, Disciplinary Counsel subpoenaed Ms. Ekekwe-Kauffman's entire client file.

Shortly after filing her disciplinary complaint, Ms. Manago also filed a claim with the Attorney-Client Arbitration Board (ACAB) seeking a refund of the fees she had paid to Ms. Ekekwe-Kauffman. Ms. Ekekwe-Kauffman relied on the June 2, 2008, invoice to support her position, which was that Ms. Manago was not entitled to a refund because she still owed $20,000 in legal fees. The ACAB rejected this argument and awarded Ms. Manago a $9,000 refund. Instead of paying Ms. Manago by the November 25, 2008, deadline, Ms. Ekekwe-Kauffman unsuccessfully moved for reconsideration with the ACAB and then filed an action in Superior Court seeking to vacate the award, relying on the June 2, 2008, invoice

---

[6] Ms. Manago never received these letters because she had moved.

in support of her claim.  Though the court affirmed the ACAB award on January 5, 2009, Ms. Ekekwe-Kauffman did not make any payments to Ms. Manago until November 2013, and she did not finish paying the full amount until April 2014.[7]

On March 4, 2015, Disciplinary Counsel filed its Specification of Charges.

### D. The Hearing Testimony

The Hearing Committee heard evidence from a number of witnesses, including Ms. Ekekwe-Kauffman, over a period of six days.  After observing her demeanor, her changing explanations, and the other testimony and evidence, the Hearing Committee "reluctantly" concluded that Ms. Ekekwe-Kauffman knowingly testified falsely on several occasions during the hearing and created a falsified invoice to use in her own defense.

First, the Hearing Committee found that Ms. Ekekwe-Kauffman testified falsely about whether and when she communicated with Ms. Manago regarding the substance of her case.  Ms. Ekekwe-Kauffman testified that she showed Ms.

---

[7] Ms. Ekekwe-Kauffman testified at the hearing that she sent payments to Ms. Manago in 2009 and 2010 but that some of her checks were returned uncashed.  She did not produce any uncashed checks or any other evidence that she had attempted to make payments before November 2013.  Moreover, her letter to Disciplinary Counsel in October 2013, in which she offered $5,000 to settle the matter without the need for bar charges, did not mention any previous attempted payments.

Manago several drafts of the complaint before it was filed and that Ms. Manago never objected to anything in the final version. The Hearing Committee credited Ms. Manago's contrary testimony and found that Ms. Ekekwe-Kauffman had just filed the written summary Ms. Manago gave her, without editing or consulting with her client. Ms. Ekekwe-Kauffman also claimed she had met with Ms. Manago on two separate days, but according to Ms. Manago, those meetings never occurred. The Hearing Committee again credited Ms. Manago's testimony, which was corroborated by other documentary evidence. For example, although Ms. Ekekwe-Kauffman testified, based on the June 2, 2008, invoice, that she had met with Ms. Manago for thirty minutes on September 6, 2005, a letter she wrote to Ms. Manago six days later contained an apology for not having been available when Ms. Manago came into the office.[8] Similarly, Ms. Manago submitted medical records to refute Ms. Ekekwe-Kauffman's testimony that the two discussed the case for forty-five minutes on September 23, 2005 (and that Ms. Manago had spent five hours at her office that day)—the medical records supported Ms. Manago's testimony that she had two medical procedures scheduled

---

[8] The letter, dated September 12, 2005, read: "I understood that you came to the office on Tuesday, September 6, 2005, at around 11:00 a.m. Sorry I missed you. I was expecting you in the afternoon around 3:00 p.m. Thank you for making the installment payment." The letter also listed the things she had advised Ms. Manago to do "[t]he last time we met in August 2005."

that day and had only dropped into the office to make a payment.

The Hearing Committee also found that Ms. Ekekwe-Kauffman had testified falsely about a discrepancy Disciplinary Counsel pointed out in her December 13, 2005, invoice. Ms. Ekekwe-Kauffman acknowledged that the invoice contained an entry stating that on October 18, 2005, she made a copy of a government motion for Ms. Manago, even though the government had not filed its motion as of that date. She insisted, however, that she had provided her client with a copy of the motion on that date, despite also billing for time spent copying the motion on November 17, 2005.

Finally, the Hearing Committee concluded that Ms. Ekekwe-Kauffman had purposely falsified the June 2, 2008, invoice. Although she explained that she created it after Ms. Manago filed her disciplinary complaint in order to obtain payment for time she had not previously billed,[9] the Hearing Committee found that several of the newly added entries did not accurately represent her time spent working on the case. For example, the invoice contained a number of entries for meetings lasting between thirty minutes and almost two hours, in August,

---

[9] Throughout the representation, Ms. Ekekwe-Kauffman provided periodic invoices to Ms. Manago, in which she billed her time at $250 per hour. Ms. Ekekwe-Kauffman never told Ms. Mango that those invoices contained any errors or that she was billing less time than she had actually spent working on the case.

September, and October 2005 (including the meeting on September 23, 2005, that the Hearing Committee found did not occur), but Ms. Manago testified that she never met with Ms. Ekekwe-Kauffman for more than fifteen minutes. The June 2, 2008, invoice also misrepresented the amount Ms. Manago had paid in legal fees, in that it both failed to account for many of the payments she made and, for the payments it did reflect, showed that she had paid less than she actually did. The Hearing Committee rejected Ms. Ekekwe-Kauffman's claim that she had reviewed her file notes and docket entries to reconstruct her activities for the June 2, 2008, invoice, noting that the file she submitted to Disciplinary Counsel around that same time included very few time records.

## E. The Findings and Recommendation

In light of its factual findings, the Hearing Committee concluded that Ms. Ekekwe-Kauffman had violated the following rules: 1.1(a), by failing to provide competent representation; 1.1(b), by failing to serve her client with skill and care commensurate with that generally afforded by other lawyers; 1.3(a), by failing to represent Ms. Manago with diligence and zeal; 1.3(b)(1), by failing to seek Ms. Manago's lawful objectives; 1.3(b)(2), by intentionally prejudicing Ms. Manago; 1.4(a) and 1.4(b), by failing to communicate adequately with Ms. Manago about her case; 1.5(a), by charging Ms. Manago an unreasonable fee; 1.15(a) and 1.15(e),

by negligently misappropriating Ms. Manago's funds and failing to hold her unearned advanced fees in trust; 1.16(d), by failing to return unearned legal fees; and 8.4(c), by acting dishonestly and engaging in fraud and misrepresentation.[10] The Committee then concluded that the appropriate sanction was disbarment.

The Board on Professional Responsibility agreed with the Hearing Committee's factual findings and conclusions of law with respect to the rule violations. It disagreed, however, with the Committee's conclusion that the misappropriation was only negligent, finding that Ms. Ekekwe-Kauffman's handling of Ms. Manago's funds was, "at a minimum, reckless." The Board nevertheless adopted the remainder of the Hearing Committee's analysis and recommended that Ms. Ekekwe-Kauffman be disbarred.

## II. Analysis

Though we review the Board's conclusions of law de novo, *In re Saint-Louis*, 147 A.3d 1135, 1147 (D.C. 2016), "we must accept the Board's evidentiary findings if they are supported by substantial evidence in the record," *In re Howes*,

---

[10] The Committee concluded that Disciplinary Counsel had not established by clear and convincing evidence violations of Rules 1.3(c) (failure to act with reasonable promptness), 3.1 (filing a frivolous lawsuit), and 8.4(d) (engaging in conduct that seriously interfered with the administration of justice).

52 A.3d 1, 12 (D.C. 2012); *see also* D.C. Bar R. XI, § 9 (h)(1).[11]  Additionally, we defer to the discipline recommended by the Board "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *In re Tun*, 195 A.3d 65, 74 (D.C. 2018) (quoting D.C. Bar R. XI, § 9 (h)(1)).

Ms. Ekekwe-Kauffman asserts a number of challenges to the Board's findings and recommended sanction.  As a threshold matter, she argues that Disciplinary Counsel's unreasonable delay in prosecuting her prejudiced her ability to defend herself and therefore that all of the charges against her must be dismissed. Ms. Ekekwe-Kauffman next takes issue with every rule violation the Hearing Committee and the Board found, in some circumstances challenging the findings of fact underlying them and in others asserting that her undisputed conduct did not violate the relevant rules.  Finally, she argues that the recommended sanction of disbarment is too severe.  We address each of these contentions in turn.

### A. Unreasonable Delay

---

[11]  The Board reviews the factual findings of the Hearing Committee using the same standard, "adopting the Hearing Committee's findings when they are based upon substantial record evidence." *In re Howes*, 52 A.3d 1, 12 n.18 (D.C. 2012).

"[A]n undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct." *In re Saint-Louis*, 147 A.3d at 1147 (quoting *In re Williams*, 513 A.2d 793, 796 (D.C. 1986) (per curiam)). Undue delay may result in a due process violation, however, if the respondent demonstrates actual prejudice—that is, that the delay in prosecution "impaired [her] defense." *Williams*, 513 A.2d at 797. Ms. Ekekwe-Kauffman asserts that Disciplinary Counsel's decision to prosecute her in 2015, almost seven years after Ms. Manago filed her disciplinary complaint, prejudiced her ability to defend herself against the charges.[12] She argues specifically that she is prejudiced because "she is unable to locate any of her former interns who were present during the representation of Ms. Manago" and that she is missing certain documents that would aid in her defense.

---

[12] Ms. Ekekwe-Kauffman presents this threshold issue as an argument that her prosecution is barred by the doctrine of laches. The party asserting a laches defense must demonstrate "an undue and unexplained delay on the part of one party which works an injustice to the other party." *Curtis v. Gordon*, 980 A.2d 1238, 1246 (D.C. 2009) (quoting *Amidon v. Amidon*, 280 A.2d 82, 84 (D.C. 1971)). Because we are not aware of any disciplinary case in which we have applied the doctrine of laches, and because we have applied the due process framework set out above to claims of undue delay in this context in the past, *see, e.g.*, *In re Saint-Louis*, 147 A.3d at 1148; *In re Williams*, 513 A.2d at 795–97, we interpret Ms. Ekekwe-Kauffman's laches argument as one asserting a due process violation. We note, moreover, that our conclusion that Ms. Ekekwe-Kauffman has not established actual prejudice would preclude a successful defense of laches in any event.

Even assuming Disciplinary Counsel's delay was undue or unreasonable,[13] we discern no due process violation in this case. As the Board explained in rejecting this argument, Ms. Ekekwe-Kauffman has not identified the missing witnesses, made a proffer of their anticipated testimony, or explained her attempts to find them. We recently rejected a similarly vague argument—that Disciplinary Counsel's long delay rendered unavailable "every . . . witness" from the client's corporation—for the same reason, where the respondent in that case had not submitted any evidence documenting his efforts to locate and subpoena those potential witnesses. *In re Saint-Louis*, 147 A.3d at 1148. Ms. Ekekwe-Kauffman also has not identified any specific document to which she no longer has access; indeed, her statement in her brief that she submitted her entire client file upon Disciplinary Counsel's request (in 2008) belies any suggestion that the passage of time has rendered important documents unavailable. Even more fundamentally, her claim that the delay caused her to lose access to relevant witnesses and

---

[13] The record contains no finding as to the reason for Disciplinary Counsel's delay because, according to Disciplinary Counsel and the Board, Ms. Ekekwe-Kauffman did not raise this argument before the Hearing Committee. Although Disciplinary Counsel urged the Board to reject this argument on waiver grounds, the Board declined to do so, noting that while there were "compelling reasons" to conclude that the argument was waived, this court had not yet expressly authorized the Board to adopt the waiver doctrine in disciplinary proceedings. Because we conclude that Ms. Ekekwe-Kauffman has not made the required showing of prejudice to assert a successful due process argument, we need not address this issue.

documents is unpersuasive in light of the fact that she was aware of the potential for misconduct charges as early as May 21, 2008, when Disciplinary Counsel wrote to her requesting a written response to Ms. Manago's complaint. In short, Ms. Ekekwe-Kauffman has failed to demonstrate that Disciplinary Counsel's delay in any way impaired her defense, and therefore we cannot conclude that it constituted a violation of her right to due process. *See id.*

## B. Rule Violations

### 1. Rules 1.1(a) and 1.1(b)

Ms. Ekekwe-Kauffman first challenges the Board's finding that she violated Rules 1.1(a) and 1.1(b) by failing to provide competent representation to her client. Rule 1.1(a) requires lawyers to provide competent representation, defined as "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Rule 1.1(b), in turn, requires lawyers to serve their clients with "skill and care commensurate with that generally afforded to clients by other lawyers in similar matters."

The Hearing Committee found, and the Board agreed, that Ms. Ekekwe-Kauffman violated Rules 1.1(a) and 1.1(b) by "mishandl[ing] Ms. Manago's civil matter in at least three respects": first, she named the District of Columbia as a defendant even though it was not a proper party under D.C. Code § 38-1202.01(a),

second, she failed to properly serve two of the named defendants, and third, she filed a "grossly deficient" complaint not just once, but a second time, after the trial court granted leave to amend. Ms. Ekekwe-Kauffman does not challenge any of the factual findings underlying these rule violations. She argues only that the fact that this court affirmed the trial court's ruling on appeal does not mean that her handling of the case violated the rules relating to competent representation.

Though Ms. Ekekwe-Kauffman is correct that a dismissal by the trial court does not always indicate incompetent representation, in this case we conclude that the deficiencies in the two complaints, which led to the dismissal with prejudice, were the result of a lack of competence and a failure to exercise the appropriate level of skill and care. The factual findings relating to the handling of Ms. Manago's case are supported by substantial evidence—namely, the trial court record. Not only does the record establish that Ms. Ekekwe-Kauffman filed a "grossly deficient" complaint[14] that improperly named the District of Columbia and asserted difficult-to-comprehend legal claims without any contemporaneous

---

[14] As the Hearing Committee found, Ms. Ekekwe-Kauffman filed "a rambling, overly long and unorganized [c]omplaint that was little more than a regurgitation of Ms. Manago's summary," which "lacked numbered paragraphs and was riddled with Ms. Manago's first-person observations and rhetorical questions, with grammatical errors, with client communications that should have been kept confidential, and with inapposite and/or incomprehensible information."

factual investigation or legal research, it also shows that she failed to correct her errors after being made aware of them and obtaining leave to amend.[15] Moreover, though Ms. Ekekwe-Kauffman properly named the UDC Board of Trustees as a defendant in the amended complaint, the affidavit of service she filed did not comply with Super. Ct. Civ. R. 4. These repeated mistakes, which led to a second dismissal with prejudice, constitute a violation of Rule 1.1(a) because they demonstrate a "serious deficiency in the representation," caused by Ms. Ekekwe-Kauffman's "fail[ure] to engage in the thoroughness and preparation reasonably necessary" for the case, that clearly prejudiced her client. *In re Evans*, 902 A.2d 56, 69–70 (D.C. 2006) (per curiam). For all of the same reasons, her handling of Ms. Manago's case fell far short of the skill and care generally afforded by other lawyers in similar matters. *See id.* at 72 ("We agree with the Committee that the same failings that constitute Respondent's 1.1(a) violations constitute 1.1(b) violations."). We therefore accept the Board's conclusion that Ms. Ekekwe-Kauffman violated Rules 1.1(a) and 1.1(b).

---

[15] For example, even though the defendants pointed out these problems with the original complaint in their motion to dismiss, the amended complaint again named the District of Columbia as a defendant and did not identify "the terms of the contract she claimed had been breached or allege 'extreme and outrageous' conduct to support the intentional infliction of emotional distress claim."

## 2. Rules 1.3(a), 1.3(b)(1), and 1.3(b)(2)

Rule 1.3 relates to a lawyer's obligation to represent clients with diligence and zeal. Rule 1.3(a) requires a lawyer to represent his or her clients "zealously and diligently within the bounds of the law." Rule 1.3(b), in turn, prohibits a lawyer from "intentionally (1) [f]ail[ing] to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules" or "(2) [p]rejudic[ing] or damag[ing] a client during the course of the professional relationship."

The Hearing Committee found, and the Board agreed, that Ms. Ekekwe-Kauffman violated Rules 1.3(a) by exhibiting a "pattern of inadequate attention to, thoughtfulness about and, ultimately, desertion of her client's matter." In particular, Ms. Ekekwe-Kauffman did no factual or legal research before filing the original civil complaint, failed to consult with Ms. Manago regarding the factual circumstances of the case, and, "[e]ven more egregiously," although she promised to file a new lawsuit for Ms. Manago, did no work on a new complaint after the dismissal was affirmed on appeal.

Ms. Ekekwe-Kauffman does not contest any of these factual findings and instead argues that she did not violate Rule 1.3(a) because she filed all of the appropriate pleadings, motions, oppositions, and appellate briefs and argued the

appeal before this court. Merely filing the appropriate documents, however, does not satisfy a lawyer's obligation to represent her client with diligence and zeal. The concept of zealous representation connotes an energy and enthusiasm for pursuing the client's objectives—a desire "to vindicate a client's cause or endeavor" through "whatever lawful and ethical measures are required." D.C. R. Prof. Conduct 1.3, Cmt. 1; *see also Zeal,* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "zeal" as a "perfervid eagerness to achieve . . . the successful resolution of a client's legal needs or difficulties"). For example, a lawyer who fails to investigate and research her client's potential legal claims and then files a complaint that appears to be written almost entirely by the client—as Ms. Ekekwe-Kauffman did here—does not demonstrate the "commitment and dedication to the interests of the client" the rule requires. D.C. R. Prof. Conduct 1.3, Cmt. 1.

While these actions alone would have violated Rule 1.3(a), Ms. Ekekwe-Kauffman's conduct throughout the remainder of the representation further compounded the violation. She filed an amended complaint containing several of the same errors that led to the dismissal in the first place, of which she must have been aware, and a defective affidavit of service on the UDC Board of Trustees, perhaps the only proper defendant in the case, leading to a second order dismissing

the case.[16]  After the dismissal was affirmed on appeal, moreover, she promised to file a new civil action against the UDC Board of Trustees and continued accepting Ms. Manago's payments for several months without doing any additional work on the case.  In the aggregate, Ms. Ekekwe-Kauffman's conduct not only fell short of her obligation to provide zealous and diligent representation—it also demonstrated a pattern of neglect, which we have defined as "indifference and a consistent failure to carry out the obligations that the lawyer has assumed to the client." *In re Wright*, 702 A.2d 1251, 1255 (D.C. 1997); *see also* D.C. R. Prof. Conduct 1.3, Cmt. 8 ("Neglect of client matters is a serious violation of the obligation of diligence.").  As Disciplinary Counsel aptly stated, it was as if Ms. Manago had no lawyer at all.

Because we agree with the board that Ms. Ekekwe-Kauffman violated Rule 1.3(a), we next consider whether she *intentionally* failed to seek her client's lawful objectives or intentionally prejudiced or damaged her client's case.  "Rule 1.3(b) does not require proof of intent in the usual sense of the word." *In re Dickens*, 174 A.3d 283, 300 (D.C. 2017) (quoting *In re Ukwu*, 926 A.2d 1106, 1116 (D.C.

---

[16]  Contrary to what Ms. Ekekwe-Kauffman appears to suggest, that she defended her defective complaints by opposing the defendants' motions to dismiss and appealing the dismissal to this court does not make up for the demonstrated lack of diligence and zeal that made those steps necessary in the first place.

2007)) (internal quotation marks omitted). "Rather, neglect ripens into an intentional violation when the lawyer is aware of her neglect of the client matter; or put differently, when a lawyer's inaction coexists with an awareness of her obligations to her client." *Id.* (cleaned up). Intent can also be found where "the neglect is so pervasive that the lawyer must be aware of it." *In re Lewis*, 689 A.2d 561, 564 (D.C. 1997).

As the Hearing Committee explained, Ms. Ekekwe-Kauffman was put on notice of the need to cure the deficiencies in her complaint when the trial court dismissed Ms. Manago's case with prejudice the first time around. Even assuming she was not previously aware of her neglect—despite having filed what the Hearing Committee called a "rambling" and "unorganized" complaint that was "riddled with Ms. Manago's first-person observations and rhetorical questions" and was based upon no factual or legal research—her failure to correct those deficiencies in the amended complaint "ripen[ed] into an intentional violation" because she was undoubtedly aware of the problems by that point. *In re Dickens*, 174 A.3d at 300; *see also In re Vohra*, 68 A.3d 766, 781 (D.C. 2013) (finding violations of Rules 1.3(b)(1) and (2) where attorney was made aware of the need to cure deficiencies in client's visa applications and failed to do so, seriously prejudicing client's pursuit of permanent resident status). This intentional neglect seriously prejudiced Ms. Manago; as the Hearing Committee summarized, by the

time the trial court's dismissal had been affirmed on appeal, Ms. Ekekwe-Kauffman "had taken over $8,000 from Ms. Manago, had provided legal services of minimal, if any, value in exchange, had thereby denied Ms. Manago the chance to have her case decided on the merits, and had eliminated any hope of obtaining Ms. Manago's desired result—the opportunity to return to the respiratory program and complete her studies." Even after the appeal concluded, Ms. Ekekwe-Kauffman continued her pattern of intentional neglect by accepting money from Ms. Manago without providing any additional legal services toward the filing of a new complaint. *See In re Ukwu*, 926 A.2d at 1116 ("[K]nowing abandonment of a client is the classic case of a Rule 1.3(b)(1) violation.") (quotation marks omitted). We agree with the Board that this conduct violated Rules 1.3(b)(1) and (2).

### 3. Rules 1.4(a) and 1.4(b)

Ms. Ekekwe-Kauffman next contests the Board's conclusion that she violated Rules 1.4(a) and (b). Rule 1.4(a) requires a lawyer to "keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." Rule 1.4(b) states that a lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

While "[a]n attorney need not communicate with a client as often as the

client would like," the attorney's communication with the client must be "reasonable under the circumstances." *In re Schoeneman*, 777 A.2d 259, 264 (D.C. 2001). Accordingly, the "guiding principle" for evaluating conduct under Rule 1.4 is whether the lawyer fulfilled "reasonable client expectations for information" consistent with the lawyer's "duty to act in the client's best interests" and the client's overall objectives. D.C. R. Prof. Conduct 1.4, Cmt. 3; *see also In re Schoeneman*, 777 A.2d at 264. "To meet that expectation, a lawyer not only must respond to client inquiries but also must initiate communications to provide information when needed." *In re Hallmark*, 831 A.2d 366, 374 (D.C. 2003). "[A] lawyer may not withhold information to serve the lawyer's own interest or convenience." *In re Mitrano*, 952 A.2d 901, 927 (D.C. 2008) (quoting D.C. R. Prof. Conduct 1.4, Cmt. 5).

The Board accepted the Hearing Committee's finding that Ms. Ekekwe-Kauffman "routinely failed to consult with and keep Ms. Manago informed about the status of her matter." For example, she did not speak with Ms. Manago before filing the first complaint or provide her with a copy before it was filed, despite Ms. Manago's specific request that she do so. She also repeatedly failed to inform Ms. Manago of the developments in her case in a timely manner. Ms. Manago testified that she had to inquire several times over a period of two or three weeks before Ms. Ekekwe-Kauffman told her that the trial court had dismissed her original

complaint. Ms. Ekekwe-Kauffman also waited more than a month before sending Ms. Manago a copy of this court's decision affirming the dismissal. We agree that this conduct constitutes a failure to keep Ms. Manago reasonably informed and to comply with her reasonable requests for information. *See, e.g.*, *In re Starnes*, 829 A.2d 488, 506 (D.C. 2003) (finding Rule 1.4(a) violation where lawyer "routinely failed to keep his clients informed of developments in their respective cases"); *In re Karr*, 722 A.2d 16, 21 (D.C. 1998) (finding Rule 1.4(a) violation where lawyer failed to provide client with copy of brief before it was filed).

The Hearing Committee also found that Ms. Ekekwe-Kauffman purposely avoided all communication with Ms. Manago toward the end of their relationship. In particular, Ms. Manago testified that after the conclusion of the appeal, she understood that Ms. Ekekwe-Kauffman was planning to file a new complaint and began making payments to cover that work. She began to feel concerned when she did not hear anything from Ms. Ekekwe-Kauffman, so she started calling and leaving messages. Ms. Ekekwe-Kauffman never returned any of her calls. Finally, in March 2008, Ms. Manago resorted to visiting her office in person to try to speak with her. Ms. Manago sat in the lobby for two hours, from 4:00 p.m. to 6:00 p.m., and even though Ms. Ekekwe-Kauffman knew she was there, she refused to see her. When Ms. Manago eventually walked to her office door and knocked, she

learned that Ms. Ekekwe-Kauffman had left the office using a different exit.[17]

We acknowledge that Ms. Ekekwe-Kauffman disputes these factual findings and testified to the contrary regarding a number of these occurrences. Yet we cannot agree that the Hearing Committee's findings were not supported by substantial record evidence. The Committee chose to credit the testimony of Ms. Manago over that of Ms. Ekekwe-Kauffman, as it was entitled to do in its role as factfinder. *See In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013); *In re Hallmark*, 831 A.2d at 373; *In re Temple*, 629 A.2d 1203, 1208–09 (D.C. 1993). We generally will not second guess such a credibility determination, *Bradley*, 70 A.3d at 1193–94, and we particularly decline to do so where, as here, there is documentary evidence corroborating the credited witness's account.[18] Having

---

[17] In addition, though the record does not reflect that Ms. Ekekwe-Kauffman affirmatively refused to meet with Ms. Manago at any point prior to March 2008, Ms. Manago testified that she never met with her for more than fifteen minutes and got the impression that Ms. Ekekwe-Kauffman did not want to talk about her case when she came in with payments. Crediting this testimony, the Hearing Committee concluded that Ms. Ekekwe-Kauffman's "dominant concern" was collecting money from Ms. Manago.

[18] For example, the witnesses gave conflicting testimony regarding Ms. Manago's visit to the office on September 6, 2005. Though Ms. Manago testified that she dropped off a payment and did not meet with Ms. Ekekwe-Kauffman, Ms. Ekekwe-Kauffman testified that they met on that date for thirty minutes. In crediting Ms. Manago's testimony and concluding that Ms. Ekekwe-Kauffman had testified knowingly falsely, the Hearing Committee cited a letter Ms. Ekekwe-Kauffman sent to Ms. Manago, which stated: "I understood that you came to the

(continued…)

accepted the Hearing Committee's factual findings as supported by substantial evidence, we agree with the Board's conclusion that Ms. Ekekwe-Kauffman violated Rules 1.4(a) and 1.4(b).

### 4. Rule 1.5(a)

Rule 1.5(a) provides that "a lawyer's fee shall be reasonable." The Hearing Committee found, and the Board agreed, that Ms. Ekekwe-Kauffman charged an unreasonable fee under whatever billing scheme she had agreed upon with Ms. Manago.[19]

---

(…continued)
office on Tuesday, September 6, 2005, at around 11:00 a.m. Sorry I missed you. I was expecting you in the afternoon around 3:00 p.m. Thank you for making the installment payment." The Hearing Committee pointed to similar documentary evidence to justify its conclusion that Ms. Ekekwe-Kauffman had testified falsely in other respects.

[19] As discussed previously in Part I.B., the Hearing Committee was unable to determine by clear and convincing evidence whether the retainer agreement called for a flat fee of $5,000 or an hourly fee of $250. The record evidence sheds little light on the specifics of the billing arrangement that was actually agreed upon in May 2005. For example, Ms. Ekekwe-Kauffman testified that she was charging Ms. Manago $250 per hour for her services, and she said that her normal practice, in civil cases, of asking for $5,000 up front did not apply in this case. She also testified that she did not intend to agree to any sort of flat fee or maximum amount. Ms. Manago's understanding of their agreement, on the other hand, was that she would pay $500 per month, or $250 every two weeks, up to a total of $5,000, which would "cover" the entire "educational matter." Moreover, despite stating multiple times that she was charging an hourly fee, Ms. Ekekwe-Kauffman also appeared to acknowledge an arrangement for monthly installment payments—

(continued…)

We first consider the flat fee scenario. Ms. Manago testified that she believed she was required to pay a total of $5,000 for the case, which would "cover [her] educational matter" in its entirety. "A flat fee is one that 'embraces all work to be done, whether it be relatively simple and of short duration, or complex and protracted.'" *In re Mance*, 980 A.2d 1196, 1202 (D.C. 2009) (quoting *Iowa Sup.Ct. Bd. of Prof. Ethics and Conduct v. Apland,* 577 N.W.2d 50, 55 (Iowa 1998)). A flat fee by definition constitutes the total amount of compensation a client agrees to pay a lawyer to represent her in a particular matter. As a result, it would be unreasonable for a lawyer who has agreed to a flat fee to demand that the client make payments in excess of that amount, at least while the matter is still within the scope of the representation initially agreed upon. Here, even assuming Ms. Ekekwe-Kauffman had agreed to represent Ms. Manago only in the trial court stage,[20] by her own records Ms. Manago had paid more than $5,000 as of August

---

(…continued)

according to her testimony, in the amount of $250 per month. Ms. Ekekwe-Kauffman's brief on appeal further contributes to the confusion; there, she states that she and Ms. Manago agreed to "compensation at the hourly rate after the $5,000 fee was exceeded." In light of these inconsistencies, we agree with the Hearing Committee's conclusion that the evidence is in "equipose" and proceed to analyze whether Ms. Ekekwe-Kauffman violated this rule and the other rules related to fees and billing in both scenarios.

[20] The retainer agreement does not explicitly limit the representation to the trial stage, and it is ambiguous as to the scope of the representation Ms. Manago and Ms. Ekekwe-Kauffman contemplated. The top of the agreement form states

(continued…)

2, 2006, seven days before the trial court denied Ms. Ekekwe-Kauffman's request for a hearing date and closed the case. Thus, if the agreement called for a flat fee of $5,000, Ms. Ekekwe-Kauffman charged an unreasonable fee when she demanded additional payments in excess of that amount.[21]

If the agreement called for an hourly fee, as Ms. Ekekwe-Kauffman testified, she still violated Rule 1.5(a) when she charged Ms. Manago for the work she promised to do—but never did—on filing a new complaint against the UDC Board of Trustees. Ms. Ekekwe-Kauffman does not dispute that she accepted $200 payments from Ms. Manago in December 2007, January 2008, and February 2008.

---

(…continued)
that Ms. Ekekwe-Kauffman will represent Ms. Manago in "Educational matter(s) in the District of Columbia," with the word "Educational" handwritten into a blank space.

[21] Ms. Ekekwe-Kauffman argues that the retainer agreement "clearly provided for compensation at the hourly rate after the $5000 fee was exceeded." We acknowledge that paragraph three of the retainer agreement states, "In the flat fee cases, the Client agrees, and consent [sic] to the specific limitation of representation to the matter listed above. And any further action beyond the specified flat fee agreement will be billed at the hourly rate of $250.00 plus cost [sic] and expenses." Nonetheless, Ms. Ekekwe-Kauffman has failed to identify (1) any contract term limiting the scope of the representation, and (2) the point at which her work on the case exceeded that scope. For example, had the retainer agreement expressly limited the representation to proceedings at the trial level, it may have been reasonable for Ms. Ekekwe-Kauffman to request additional funds to pursue an appeal in this court. The retainer agreement Ms. Manago signed, however, does not contain any such limitation. Ms. Ekekwe-Kauffman's reliance on that provision of the retainer agreement is therefore unavailing.

She also does not dispute that she did no work on a new complaint after this court affirmed the dismissal of Ms. Manago's case in November 2007.[22] Because "[i]t cannot be reasonable to demand payment for work that an attorney has not in fact done," *In re Cleaver-Bascombe*, 892 A.2d 396, 403 (D.C. 2006), Ms. Ekekwe-Kauffman charged an unreasonable fee by demanding payments during this time period.

In sum, we agree with the Board and the Hearing Committee that Ms. Ekekwe-Kauffman violated Rule 1.5(a) by charging Ms. Manago an unreasonable fee under whichever billing arrangement—hourly or flat fee—was used.

### 5. Rules 1.15(a) and 1.15(e)

Ms. Ekekwe-Kauffman next challenges the Board's conclusion that she violated Rules 1.15(a)[23] and (e)[24] by misappropriating funds belonging to Ms.

---

[22] The June 2, 2008, invoice that Ms. Ekekwe-Kauffman created retroactively does contain an entry for a "conference w/ client" that lasted forty-five minutes on January 25, 2008. Even assuming this entry from the June 2, 2008, invoice—which the Hearing Committee found not to be credible—is accurate, Ms. Ekekwe-Kauffman still overcharged Ms. Manago by more than $400 during this time period.

[23] Rule 1.15(a) provides, in relevant part, that "[a] lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds of clients or third persons that are in the lawyer's possession (trust funds) shall be kept in one or more trust accounts maintained in accordance with paragraph (b)."

Manago. Misappropriation is defined as "any unauthorized use of client's funds entrusted to a lawyer, including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not she derives any personal gain or benefit therefrom." *In re Edwards*, 808 A.2d 476, 482 (D.C. 2002) (quoting *In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983)) (brackets omitted). To guard against the loss of clients' money, Rule 1.15(a) also requires a lawyer to hold client funds in a separate trust account and to avoid commingling her clients' funds with her own property. *In re Hessler*, 549 A.2d 700, 700 (D.C. 1988). Though commingling and misappropriation both constitute violations of Rule 1.15(a), misappropriation is the "more egregious Rule 1.15(a) violation, for which disbarment is the presumptive sanction." *In re Daniel*, 11 A.3d 291, 301 (D.C. 2011). Whether the facts found by the Hearing Committee constitute misappropriation is a question of law concerning "ultimate facts," which we review de novo. *In re Hewett*, 11 A.3d 279, 284–85 (D.C. 2011) (internal quotation marks omitted).

When an attorney deposits client funds into the attorney's operating account,

---

(…continued)

[24] Rule 1.15(e) provides, in relevant part, that "[a]dvances of unearned fees and unincurred costs shall be treated as property of the client pursuant to paragraph (a) until earned or incurred unless the client gives informed consent to a different arrangement."

she engages in commingling. *In re Micheel*, 610 A.2d 231, 233 (D.C. 1992). She does not engage in misappropriation, however, until "the balance in that account falls below the amount due to the client." *Id.* At the hearing, Ms. Ekekwe-Kauffman admitted that she never held any of Ms. Manago's payments in trust, and bank records submitted by Disciplinary Counsel showed that Ms. Ekekwe-Kauffman deposited at least some of Ms. Manago's payments into a business operating account with Bank of America. Ms. Ekekwe-Kauffman contended, as she does on appeal, that she was never obligated to deposit any of the payments into a trust account because Ms. Manago was always behind—in her view, she had earned every payment at the time it was made.

In order to determine whether Ms. Ekekwe-Kauffman violated Rules 1.15(a) and (e), we must first determine whether any of the money she accepted from Ms. Manago should have been treated as Ms. Manago's property—that is, whether she ever accepted money from Ms. Manago as payment for fees she had not yet earned or costs she had not yet incurred. *See* D.C. R. Prof. Conduct 1.15(e); *In re Mance*, 980 A.2d at 1203 (explaining that an "advance of unearned fees . . . must be held as client funds in a client's trust or escrow account until they are earned by the lawyer's performance of legal services"). We find substantial evidence in the record to show that there were certain points at which she was required to treat Ms. Manago's payments as client funds. In particular, if the retainer agreement called

for an hourly fee of $250, as Ms. Ekekwe-Kauffman asserted, she was required to hold Ms. Manago's first two payments of $250—made on May 13, 2005, and May 23, 2005—in trust until she had done two hours of work on the case. According to Ms. Ekekwe-Kauffman's own records, however, she did not work on the case at all until May 24, 2005, and she did not earn the whole $500 until June 15, 2005. If the agreement was to a $5,000 flat fee, on the other hand, Ms. Manago's payments became advances of unearned fees as soon as the total amount she had paid exceeded $5,000.[25]

It is undisputed, moreover, that Ms. Ekekwe-Kauffman never held any of Ms. Manago's payments in a trust or escrow account. In response to Disciplinary Counsel's question whether she was holding her money in trust, Ms. Ekekwe-Kauffman responded, "Why would I? I was working on her case, and she was behind." She went on to state unequivocally that "[t]here was no money held on

---

[25] Our decision in *In re Mance* held "for the first time that under Rule 1.15(d) flat fees are an advance of unearned fees that belong to the client until earned by the lawyer (unless other reasonable arrangements have been made)[.]" 980 A.2d 1196, 1205–06 (D.C. 2009). We made this holding prospective only, recognizing that the rule's application to flat fees was "not clear on its face." *Id.* at 1206. Contrary to what Ms. Ekekwe-Kauffman has asserted on appeal, the Hearing Committee did not apply the *Mance* rule to her conduct, which occurred prior to 2009. It found that, although she would have been entitled to treat the first $5,000 as her own, any amount *in excess* of $5,000 should have been treated as Ms. Manago's property.

behalf of Ms. Manago. Her money was used to work on her case as it was being worked on." Ms. Ekekwe-Kauffman's testimony also suggested that, rather than using a trust account, she deposited all of Ms. Manago's payments into her operating accounts—even though, as we have found, there were certain points at which the payments should have been treated as Ms. Manago's property. We are therefore satisfied that the record contains substantial evidence that Ms. Ekekwe-Kauffman violated Rules 1.15(a) and (e) by failing to hold unearned client funds in trust and commingling client funds with her own. *In re Micheel*, 610 A.2d at 233.

The Hearing Committee went further, however, and concluded that Ms. Ekekwe-Kauffman misappropriated client funds based on its finding that she failed to hold unearned fees in trust and that she "took" unearned payments for herself. But misappropriation does not necessarily occur just because a lawyer takes or accepts unearned funds from a client. Indeed, even depositing unearned funds into an operating account, though it violates Rule 1.15's prohibition against commingling, does not alone constitute misappropriation. *See In re Edwards*, 808 A.2d at 482 (noting that "commingling in itself [does] not amount to misappropriation"). For misappropriation to occur, the balance in that account must fall below the amount the lawyer was required to hold in trust for the client at that particular time. *Id.*; *In re Micheel*, 610 A.2d at 233. Neither the Hearing Committee nor the Board made any finding that the balance in Ms. Ekekwe-

Kauffman's operating account, into which she deposited Ms. Manago's payments, dropped below the amount she should have been holding—or, in other words, that she had not yet earned—at any given point. We cannot accept the Committee's reasoning, which the Board adopted, because it skips this key step in the analysis.

Nor do we find substantial evidence elsewhere in the record to support the finding that misappropriation occurred. At the hearing, Disciplinary Counsel attempted to prove misappropriation using the records it obtained from Ms. Ekekwe-Kauffman's Bank of America operating account, and it introduced a summary chart created by its investigator purporting to show that there were sixty-two days in the year 2007 when Ms. Ekekwe-Kauffman's account balance was less than the amount she owed to Ms. Manago. The chart indicated that the amount owed to Ms. Manago as of May 10, 2007, was $1,617.51, and it showed that, for several dates between May and November 2007, the balance in the account was less than whatever amount she owed to Ms. Manago on each of those dates (adjusting for any work billed during this period).[26] As the Hearing Committee

---

[26] The $1,617.51 figure came from Ms. Ekekwe-Kauffman's invoice dated May 10, 2007, where it was shown in parentheses across from the words "Amount Due." Though Ms. Ekekwe-Kauffman disputed the notion that Ms. Manago ever had a credit on her account and claimed that the parentheses only represented payments made, Disciplinary Counsel asserted that the amounts in parentheses at the end of the invoices constituted credits owed to Ms. Manago. The Hearing Committee did not resolve this particular dispute, and we need not do so here, as

(continued…)

recognized, however, the comparison between the amount that should have been held in trust and the amount in the operating account "is not apposite unless Disciplinary Counsel first proves that the $1,617.51 in entrusted funds were actually deposited into the bank account." We agree with the Committee that Disciplinary Counsel did not adduce such evidence. Although the investigator testified that all of Ms. Manago's payments that he was able to track were deposited into the one relevant operating account, he admitted that Ms. Ekekwe-Kauffman was using two additional operating accounts for her business—accounts for which Disciplinary Counsel did not subpoena records. He also admitted that he would not be able to track payments made in cash and therefore would not have been able to tell if any of Ms. Manago's cash payments had been deposited into either of the other two accounts. As there was undisputed evidence in the record that Ms. Ekekwe-Kauffman in fact had other operating accounts and that Ms. Manago did make several payments in cash, Disciplinary Counsel's inability to show that at least $1,617.51 of Ms. Manago's money had been deposited into the relevant operating account is significant. Absent evidence that Ms. Ekekwe-Kauffman deposited that much of Ms. Manago's money into that particular

---

(…continued)
we find no misappropriation even accepting the accuracy of Disciplinary Counsel's chart.

account, the fact that the account balance was less than the amount she owed to Ms. Manago does not establish misappropriation. *See In re Edwards*, 808 A.2d at 484 ("The fact that the balance in the escrow account fell below $430.86 . . . is without significance because the [client's] money was not deposited in that account."); *In re Ingram*, 584 A.2d 602, 603 (D.C. 1991) (finding no misappropriation where lawyer's bank account fell below $1,000, the amount he was required to hold for his client, but where the client's money was kept in the client file and not deposited into that account).

In summary, although we agree that Ms. Ekekwe-Kauffman violated Rules 1.15(a) and (e) by failing to hold the unearned portions of Ms. Manago's payments in trust—and more specifically, by commingling Ms. Manago's property with her own—we conclude that the record lacks substantial evidence to support the Board's finding that she also committed the "more egregious" offense of misappropriation. *In re Daniel*, 11 A.3d at 301.

### 6. Rule 1.16(d)

Ms. Ekekwe-Kauffman next contends that she did not violate Rule 1.16(d), which requires a lawyer to return all unearned fees, because she had earned all of the money Ms. Manago paid her. Rule 1.16(d) states that a lawyer shall, upon the termination of the representation, "take timely steps to the extent reasonably

practicable to protect a client's interests," including "refunding any advance payment of fee or expense that has not been earned or incurred."

Even if Ms. Ekekwe-Kauffman believed, at the time Ms. Manago discharged her as her lawyer, that she did not owe her any money, the ACAB decision directing her to refund $9,000 should have resolved any uncertainty. *See In re Martin*, 67 A.3d 1032, 1047 (D.C. 2013) ("If the ACAB issues an award in favor of the client in a fee dispute, the attorney is required to give this sum to the client under Rule 1.16(d)[.]"). Moreover, although "[w]e fully recognize the right of an attorney to challenge an ACAB award according to applicable law[,]" *id.* at 1049, Ms. Ekekwe-Kauffman's legal challenge to the ACAB award was rejected, and the award affirmed, by early 2009, almost five years before she made her first payment and more than six years before she paid the award in full. We think it clear, under these circumstances, that Ms. Ekekwe-Kauffman did not take "timely steps" to comply with the ACAB's decision as required by Rule 1.16(d), and we agree with Board that her conduct constituted a violation of that rule.

## 7. Rule 8.4(c)

Finally, Ms. Ekekwe-Kauffman challenges the Board's conclusion that she engaged in conduct involving dishonesty, fraud, and misrepresentation in violation

of Rule 8.4(c).[27] The concepts of dishonesty, fraud, and misrepresentation each have a distinct meaning, though they overlap in certain respects. Dishonesty is the most general of the violations. It includes "not only fraudulent, deceitful or misrepresentative conduct, but also 'conduct evincing a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness.'" *In re Samad*, 51 A.3d 486, 496 (D.C. 2012) (quoting *In re Shorter*, 570 A.2d 760, 767–68 (D.C. 1990)). Fraud and misrepresentation are more specific and require "active deception or positive falsehood." *In re Shorter*, 570 A.2d at 768. Fraud "embraces all the multifarious means . . . resorted to by one individual to gain advantage over another by false suggestions or by suppression of the truth," *In re Austin*, 858 A.2d 969, 976 (D.C. 2004) (quoting *Shorter*, 570 A.2d at 767 n.12), and, unlike dishonesty, requires a showing of intent to defraud or deceive. *In re Romansky*, 825 A.2d 311, 315 (D.C. 2003). Misrepresentation, finally, is an untrue or incorrect representation, statement, or account. *In re Shorter*, 570 A.2d at 767 n.12.

The Hearing Committee concluded, after "painstaking analysis," that Ms. Ekekwe-Kauffman submitted a deliberately falsified document—the June 2, 2008,

---

[27] Rule 8.4(c) provides that it is "professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]"

invoice—to Disciplinary Counsel, the ACAB, and the Superior Court. Ms. Ekekwe-Kauffman admitted that she only created the June 2, 2008, invoice after Ms. Manago filed a disciplinary complaint against her and claimed that although she had not previously billed Ms. Manago for all of the hours she spent working on her case, the June 2, 2008, invoice showed all of the hours (102.83 in total) she could have claimed. She testified that she created the invoice because Ms. Manago was claiming that Ms. Ekekwe-Kauffman "didn't do anything on her case" and because she wanted to get paid for the time she actually spent working on the case. The Hearing Committee found, however, that a number of the entries on the June 2, 2008, invoice were incorrect. For example, the June 2, 2008, invoice did not reflect several of the payments Ms. Manago had made, which meant that the total amount she appeared to have paid in legal fees according to the June 2, 2008, invoice was less than the amount she had actually paid. The June 2, 2008, invoice also contained entries for client counseling sessions the Hearing Committee found did not occur.[28]

---

[28] For example, the invoice billed time for a thirty-minute meeting on September 6, 2005, yet Ms. Ekekwe-Kauffman's own records contained a copy of a letter she wrote to Ms. Manago apologizing for having "missed" her on that date. The invoice also claimed that she had met with Ms. Manago for forty-five minutes on September 23, 2005, but Ms. Manago's medical records corroborated her contrary testimony that she had only stopped into the office briefly to make a payment.

We are satisfied that substantial evidence supports the conclusion that Ms. Ekekwe-Kauffman deliberately falsified the June 2, 2008, invoice. Her argument that any incorrect entries were the result of good-faith mistakes is undermined by her testimony at the hearing, which the Hearing Committee found to have been knowingly false. In particular, when confronted with the discrepancies between the June 2, 2008, invoice and prior invoices, Ms. Ekekwe-Kauffman testified that she had reviewed the notes in her file and the court's docket entries in order to reconstruct her work on Ms. Manago's case that had not been included on prior invoices. She testified at a different point, however, that she had submitted her entire client file to Disciplinary Counsel in response to its subpoena, and as the Hearing Committee noted, that file contained very few time records specific to Ms. Manago's case. Moreover, as previously explained, at least one of the new entries on the June 2, 2008, invoice was refuted by Ms. Ekekwe-Kauffman's own records, further undermining her claim to have revisited Ms. Manago's client file to reconstruct the time she spent on the case. Finally, she failed to advise Disciplinary Counsel, the ACAB, or the Superior Court that the June 2, 2008, invoice, on which she relied in her defense, was different from the previous invoices she had sent to Ms. Manago.

Coupled with the Hearing Committee's assessment of Ms. Ekekwe-Kauffman's credibility, to which we defer, *In re Hallmark*, 831 A.2d at 373, this

context provides substantial support for the conclusion that the inaccuracies in the June 2, 2008, invoice were the result of intentional falsification. We have no doubt that deliberately falsifying an invoice and submitting that invoice as evidence in legal proceedings constitutes conduct involving dishonesty, fraud, and misrepresentation, in violation of Rule 8.4(c). *See, e.g.*, *In re Cleaver-Bascombe*, 892 A.2d at 404 (finding Rule 8.4(c) violation where attorney deliberately made false representation in CJA voucher).

## III.  Sanction

We now turn to the question of the appropriate sanction in this case. Though we normally adopt the Board's recommendation as long as it "falls within the wide range of acceptable outcomes," *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (quoting *In re Elgin*, 918 A.2d 362, 376 (D.C. 2007)), "the responsibility for imposing sanctions rests with this court in the first instance," *In re Chapman*, 962 A.2d 922, 924 (D.C. 2009) (quotation marks and citation omitted). Here, the Board relied on its finding of reckless misappropriation, for which the presumptive sanction is disbarment, *In re Malyszek*, 182 A.3d 1232, 1233 (D.C. 2018), to justify its recommendation. Because we have found that the evidence in the record failed to establish misappropriation, we owe this recommendation no deference and conduct a new analysis of the appropriate sanction based upon the remaining

rule violations.

In imposing professional discipline, we aim "not only to maintain the integrity of the profession and to protect the public and the courts, but also to deter other attorneys from engaging in similar misconduct." *In re Martin*, 67 A.3d at 1053 (quotation marks and citation omitted). Our purpose is not to punish. *In re Fay*, 111 A.3d 1025, 1031 (D.C. 2015). To serve these objectives, our determination of the appropriate sanction takes into account a number of factors, such as "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances." *In re Martin*, 67 A.3d at 1053 (citing *In re Elgin*, 918 A.2d at 376).

Even without a finding of misappropriation, Ms. Ekekwe-Kauffman's misconduct was serious. Ms. Ekekwe-Kauffman provided wholly incompetent representation to Ms. Manago by failing to conduct any factual or legal research before filing the complaint or, even more significantly, failing to correct her mistakes after she was made aware of them. She also violated several other core obligations to her client, including the duty to communicate effectively and to pursue her client's lawful objectives with diligence and zeal. Moreover, despite

failing to provide any legal services of value, she demanded that Ms. Manago make regular installment payments—which at various points exceeded the amount to which she was entitled—and, failing to recognize that she was not entitled to all of those fees, violated her obligation to safeguard client property and resisted Ms. Manago's attempt to obtain a refund when their relationship ended. As a result of Ms. Ekekwe-Kauffman's incompetence and disregard of the ethical rules, Ms. Manago suffered significant prejudice; not only was her case dismissed,[29] depriving her of whatever opportunity she may have had to have her case heard on the merits, but she also spent several thousand dollars over the course of three years and was forced to pursue disciplinary action in order to obtain a refund of the money she was owed.

Though Disciplinary Counsel asserts that Ms. Ekekwe-Kauffman engaged in "pervasive dishonesty" as early as 2007, during the course of the attorney-client relationship, we do not attribute any dishonest or malicious motive to the rule

---

[29] We in no way suggest that a dismissal for failure to state a claim—or even for lack of service—necessarily indicates that the attorney has provided incompetent representation, and we express no opinion on the merit of Ms. Manago's civil case. Our finding of incompetence is based on the specific circumstances of this case, in which Ms. Ekekwe-Kauffman failed to do any factual investigation or legal research and in which many of her fatal errors could have been avoided if she had studied the relevant civil rules, statutes, and related case law.

violations relating to the representation itself. Indeed, Ms. Ekekwe-Kauffman's hearing testimony indicates that she did not—and still does not—understand that she did anything wrong. With respect to the fee arrangement, for example, we discern from her repeated insistence that Ms. Manago was never ahead in her payments, in the face of clear evidence to the contrary, that she was ignorant of the rules surrounding permissible fee arrangements and reasonable fees. We do not suggest that her ignorance of the rules in any way mitigates the seriousness of these violations—to the contrary, "an attorney is presumed to know the ethical rules governing [her] behavior." *In re Devaney*, 870 A.2d 53, 57 (D.C. 2005); *In re Smith*, 817 A.2d 196, 202 (D.C. 2003). Yet we also do not find that she accepted unreasonable fees deliberately or with the goal of enriching herself.

Once Ms. Manago terminated the representation and initiated disciplinary proceedings, however, Ms. Ekekwe-Kauffman initiated a campaign of dishonesty in order to defend herself. Upon receiving notice of Ms. Manago's disciplinary complaint, Ms. Ekekwe-Kauffman created and deliberately falsified the June 2, 2008, invoice and submitted it to the ACAB, the Superior Court, and Disciplinary Counsel with the intent to convince all three that Ms. Manago was not entitled to a refund. She then gave knowingly false testimony at the hearing about the invoice and other aspects of the representation, which further aggravates the seriousness of her misconduct. We have said that "[t]here is nothing more antithetical to the

practice of law than dishonesty," *In re Daniel*, 11 A.3d at 300, and we agree with

Disciplinary Counsel and the Hearing Committee that this extended pattern of

conduct, which spanned from 2008 through the evidentiary hearing in late 2015, is

particularly egregious. We also agree, based on our own review of the hearing

transcript and Ms. Ekekwe-Kauffman's argument before this court, where she

continued to insist she had done nothing wrong, that she still "does not recognize

or acknowledge her missteps, let alone their gravity."[30]

In light of these factors and Ms. Ekekwe-Kauffman's other rule violations,

and discounting the Board's finding of reckless misappropriation, we conclude that

this case is most analogous to *In re Daniel*, 11 A.3d 291 (D.C. 2011), and thus

adopt an analogous sanction. In *In re Daniel*, the respondent likewise commingled

personal funds with entrusted funds but did not misappropriate funds, though he

lied to the government entity investigating his case and made materially false

statements to the Hearing Committee. *Id.* at 301. The Board concluded that Mr.

Daniel committed multiple violations of the rule prohibiting dishonest conduct and,

highlighting his lack of remorse and negative attitude toward the disciplinary

---

[30] For this reason, we do not find significant the "mitigating evidence" that Ms. Ekekwe-Kauffman has taken CLE courses, participated in law practice management workshops, and implemented office protocols to track client communications and client funds.

process, recommended a three-year suspension and imposed a fitness requirement as a condition of Mr. Daniel's reinstatement, which this court adopted. *Id.* at 300–01. Because Ms. Ekekwe-Kauffman's case parallels this case in several important respects, our precedent dictates a comparable suspension in her case. *See also In re Kline*, 11 A.3d 261, 267 (D.C. 2011) (imposing a three-year suspension where the respondent negligently misappropriated funds, conducted himself in a manner reflecting a "prejudicial disregard" for his client's interests, and forged a client's signature on a settlement agreement).

As in *Daniel*, it is appropriate, in particular, to impose a fitness requirement as a condition of Ms. Ekekwe-Kauffman's reinstatement because there is clear and convincing evidence of "serious doubt" about Ms. Ekekwe-Kauffman's continuing fitness to practice law. *In re Cater*, 887 A.2d 1, 22 (D.C. 2005). In *Cater*, we cited five guiding factors this court may consider when assessing whether there is "serious doubt" about an attorney's fitness: "'(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.'" *Id.* at 21 (quoting *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985)). Weighing these factors here, we

are persuaded that the evidence of misconduct as to at least three factors is overall sufficient to warrant imposing a fitness requirement. As to the first factor, the evidence shows that, like in *Daniel*, Ms. Ekekwe-Kauffman "is comfortable acting dishonestly," *Daniel*, 11 A.3d at 302, as illustrated by the pattern of dishonesty towards Ms. Manago, the Hearing Committee, and the Board. As to the second factor, before this court Ms. Ekekwe-Kauffman has "continue[d] to deny any misconduct in spite of clear and convincing evidence to the contrary," *id*. *See also In re Pennington*, 921 A.2d 135, 143 n.3 (D.C. 2007) (explaining that sanction of suspension with a fitness requirement was warranted in part because Ms. Pennington had "not express[ed] remorse for her deceitful actions"). And as to the fifth factor, Ms. Ekekwe-Kauffman's misconduct creates "serious doubt" as to her professional competence. As discussed above, Ms. Ekekwe-Kauffman failed to perform any factual investigation or legal research, filed a "grossly deficient" complaint, failed to correct her errors after being made aware of them, and deprived her client of any opportunity for relief. This is not an instance where the misconduct stemmed from "heightened emotional circumstances" or "the 'pressure of the moment,'" *see In re Tun*, 195 A.3d at 78 (quoting *In re Guberman*, 978 A.2d 200, 212–13 (D.C. 2009)). Ms. Ekekwe-Kauffman instead exhibited a pattern of intentional neglect and professional incompetence for several years while continuing to accept money for legal services that she never rendered. Taken

together, the evidence supports imposing a fitness requirement on Ms. Ekekwe-Kauffman's reinstatement to practice law. *See In re Ukwu*, 926 A.2d at 1119 (imposing a fitness requirement where an attorney "pervasive[ly] neglect[ed]" client matters, caused a letter to be sent to the INS falsely representing that a client was employed, and gave untruthful testimony before a Hearing Committee).

## IV.

For the reasons stated in this opinion, Ms. Ekekwe-Kauffman is suspended from the practice of law in the District of Columbia for three years. As a condition of reinstatement, Ms. Ekekwe-Kaufman must prove fitness, pursuant to D.C. Bar R. XI, § 16. We also direct her attention to D.C. Bar R. XI, § 14 governing the responsibilities of suspended attorneys.

*So ordered.*