*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-BG-630

IN RE JONATHAN R. SCHUMAN, RESPONDENT.

A Member of the Bar of the District of Columbia Court of Appeals
(Bar Registration No. 459087)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-020-18)

(Argued October 28, 2020                    Decided   June 10, 2021)

*Jonathan R. Schuman*, pro se.

*Jelani C. Lowery*, Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, and *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*:  Schuman & Felts—a law firm serving landlords in the District of Columbia—received refund checks totaling several hundred thousand dollars from the D.C. Superior Court in 2013.  The checks refunded court fees paid to carry out evictions that never occurred.  Though the court fees were originally paid out of Schuman & Felts's operating account, the firm was reimbursed by its

clients for advancing the fees. Any refund thus belonged to the firm's clients and not to the firm. Jonathan Schuman, the firm's sole managing partner, decided how to handle the refund checks. Current clients received their refunds. Former clients did not and were unaware of their existence. Their refunds were instead deposited into Schuman & Felts's operating account and used to pay the firm's business expenses.

That scheme ultimately came to light. Now the Board on Professional Responsibility recommends that Schuman be disbarred for it. More specifically, it recommends disbarment based on in its view that Schuman violated the following District of Columbia Rules of Professional Conduct: Rule 1.15(a), commingling and intentional misappropriation of client funds; Rule 1.15(a), failure to keep proper records; Rule 1.15(c), failure to notify and deliver client funds; and Rule 8.4(c), engaging in conduct involving dishonesty. Schuman challenges the Board's recommendation as to each rule violation found. His primary retort is that the Board misinterpreted Rule 1.15. He contends that the refunded court fees were not entrusted client funds—and thus, could not have been misappropriated under that rule—because the court fees were paid out of Schuman & Felts's operating account and were originally paid by the firm's clients to satisfy a legal bill. We disagree and

hold that the refund checks were entrusted client property that Schuman was required to handle in accordance with Rule 1.15.

Because Schuman misappropriated his former clients' funds, disbarment is the presumptive sanction. *In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc). Schuman contends this presumption is overcome here because his misconduct stemmed from severe depression and, in his view, that qualifies as an "extraordinary circumstance[]" worthy of mitigating the presumptive sanction. Based on the record before us, we cannot fault the Board for determining that Schuman failed to establish a causal connection between his depression and his misconduct. We therefore adopt the Board's recommended sanction and disbar him.

**I.**

In 1998, Schuman became a member of the D.C. Bar and joined his father's law firm, Schuman & Felts. He later joined the ranks of partner alongside his father and another attorney, Timothy Cole, with each possessing a one-third partnership interest in the firm. In 2012, Schuman's father retired, transferring his one-third share of the partnership to Schuman. Displeased with this decision, Cole left Schuman & Felts in early 2012, "taking as many as 70 percent of the firm's clients with him." The "[l]oss of clients to Mr. Cole's new firm caused considerable . . .

financial damage to Schuman & Felts" and "the need for additional income to replace that lost to Mr. Cole's firm became critical by early 2013."

As if on cue, in January 2013, Schuman & Felts began receiving checks—sometimes hundreds of checks at a time—from the D.C. Superior Court for $165 each. The checks came without warning or explanation, with the only identifying feature on each being a landlord/tenant docket number. Schuman's staff called the Clerk of the Landlord & Tenant Branch of the D.C. Superior Court, who advised that the checks were refunds for certain "Writ of Restitution" fees paid by Schuman & Felts, dating back to 2009. Writs of Restitution are orders permitting a landlord to evict a tenant. The refunds were for the many instances where writs were paid for but never executed. While Schuman & Felts had initially paid the writ fees out of its operating account, by the time it began receiving the refund checks, its clients had reimbursed the firm for those expenses. The refunds, in short, belonged to the clients who had paid for the unexecuted writs.

Schuman acted accordingly as to refunds owed to his firm's current clients: he forwarded their respective refund checks or, when authorized to do so, credited their refunds to their accounts. But former clients were left in the dark. Their refunds were deposited into Schuman & Felts's operating account and used to pay

the firm's expenses. Schuman later offered an explanation for the disparate treatment. As he explained it, writ refunds were forwarded to current clients not out of financial obligation but "as a matter of goodwill," to "demonstrat[e] his attentiveness to his clients." He simply had no similar need or desire to build goodwill with clients who had left the firm.

From January 2013 to February 2014, the firm deposited $316,220 worth of clients' writ refund checks into its operating account. Yet bank records showed the operating account's balance fell to about $85,000 in February 2014. In other words, if not for the writ refunds, the firm's operating account balance would have been in the negative by more than $230,000 in February 2014; bank records further showed that the account's balance—absent the writ refunds—would have been in the negative in all but one month of the preceding year. Schuman confirmed as much when he testified that the refunds belonging to former clients were used to "float the firm."

The scheme started to unravel in early 2014 when Cole, Schuman's former partner, inquired whether Schuman & Felts had received any writ refunds for his client, WDC-1 (previously a client of Schuman & Felts). Schuman replied that he "endorsed the backs of the checks and . . . forwarded to the clients." When Cole

pressed for more information, including documentation, Schuman testified that he checked with a staff member and then informed Cole that "[a]nything that came in for WDC-1 should have gone to them." The staff member in question testified, to the contrary, that Schuman never asked her to look into the WDC-1 refunds. Cole then contacted the D.C. Courts Financial Operations Budget & Finance Division and discovered that Schuman had deposited two writ refund checks belonging to WDC-1 into Schuman & Felts's operating account. After learning this, Cole filed a complaint with the Office of Disciplinary Counsel.

Following Cole's inquiry, Schuman consulted with an attorney about his handling of the writ refunds. On counsel's advice, he then began forwarding writ refunds to former clients. By the end of March, Schuman & Felts had returned $257,400 worth of writ refunds to former clients. During Disciplinary Counsel's investigation into Cole's complaint, Schuman was asked to account for the $58,820 difference between the amount of writ refunds deposited into the firm's operating account and the amount Schuman refunded to former clients. Schuman provided records accounting for $24,429 of the shortfall, but was unable to account for the remainder.

After its investigation, Disciplinary Counsel charged Schuman with violating Rules 1.15 and 8.4 of the District of Columbia Rules of Professional Conduct. A Hearing Committee then held a multi-day hearing in August and October 2018.

## II.

The Hearing Committee found that Disciplinary Counsel established by clear and convincing evidence that Schuman violated Rule 1.15(a) by commingling and intentionally misappropriating client funds; Rule 1.15(c) by failing to promptly notify clients of Schuman & Felts's receipt of the writ refunds, as well as failing to promptly deliver those funds; and Rule 8.4(c) by acting dishonestly in retaining and spending his former clients' writ refunds. It did not, however, find that Disciplinary Counsel carried its burden in proving that Schuman violated Rule 1.15(a)'s record keeping requirements relating to the unaccounted-for $34,391 worth of writ refunds deposited into Schuman & Felts's operating account. And it did not find it necessary to consider Schuman's misstatements to Cole regarding WDC-1's writ refunds to reach its decision that Schuman violated Rule 8.4(c). On review, the Board largely agreed with the Hearing Committee's findings but found that Disciplinary Counsel had carried its burden of establishing that Schuman violated Rule 1.15(a)'s record keeping requirements and that, in addition to the dishonesty inherent in Schuman's

handling of the writ refunds, Schuman also violated Rule 8.4(c) when he made false statements to Cole regarding WDC-1's writ refunds.

Schuman takes exception to each of the rule violations found by the Board, primarily arguing that his conduct did not violate the relevant rules. We address each rule violation in turn, accepting the Board's "findings of fact 'unless they are unsupported by substantial evidence of record,'" and reviewing "questions of law and ultimate facts *de novo*." *In re Martin*, 67 A.3d 1032, 1039 (D.C. 2013) (first quoting *In re Pierson*, 690 A.2d 941, 946 (D.C. 1997), and then citing *In re Anderson,* 778 A.2d 330, 339 n.5 (D.C. 2001)).

## A. Rule 1.15(a) (Safekeeping Property)

The Board found that Schuman intentionally misappropriated and commingled client funds in violation of Rule 1.15(a) when he retained and spent writ refunds belonging to former clients. Schuman does not challenge the Board's factual findings as to either violation, but instead asserts that the Board's threshold legal premise—that the writ refunds fall within the purview of Rule 1.15(a)—was faulty. He argues the writ refunds were not "entrusted funds" because he did not receive them from a client; they were instead refunds from the D.C. Superior Court

for fees that had originally been paid from Schuman & Felts's operating account.[1]
Because the funds were not "entrusted," Schuman claims he could not have violated
Rule 1.15. *See In re Ekekwe-Kauffman*, 210 A.3d 775, 792 (D.C. 2019) (per curiam)
("Misappropriation is defined as 'any unauthorized use of client's funds entrusted to
a lawyer.'") (quoting *In re Edwards*, 808 A.2d 476, 482 (D.C. 2002)).[2]

We disagree and conclude the refunded amounts were entrusted funds. There
is no meaningful distinction between this case and one where an attorney misuses,
for his own purposes, a client's funds received from a third party pursuant to a
settlement agreement. Such instances are examples of "clear misappropriation." *In
re Pierson*, 690 A.2d at 947; *see also In re Pels*, 653 A.2d 388, 393–95 (D.C. 1995)

---

[1] Schuman also argues that the writ refunds were property of Schuman &
Felts, not of its clients, as a further reason for the inapplicability of Rule 1.15(a).
Schuman offers no legal argument to support this contention, and we have no reason
to disagree with the Board that the writ refunds were client property. Schuman all
but conceded this point when he stated during oral argument that his clients were
legally entitled to the writ refunds, as well as when he testified before the Hearing
Committee that keeping the writ refunds was "improper" and "wrong."

[2] Although our cases often define misappropriation as the "unauthorized use
of a client's *entrusted* funds," *In re Gray*, 224 A.3d 1222, 1229 (D.C. 2020)
(emphasis added), this court suggested recently that misappropriation might occur
even where no "entrustment" has taken place, *see In re Harris-Lindsey*, 242 A.3d
613, 626 n.1 (D.C. 2020) (Glickman, J., joined by Beckwith, J., concurring). We
need not grapple with this question—or what type of conduct would fall within this
potential gray area—because there was "entrustment" in this case.

(finding misappropriation where attorney used settlement proceeds to pay personal and business expenses). As with settlement proceeds, Schuman received funds from a third party that belonged to his clients and he was obligated to handle those funds in accordance with Rule 1.15.

Schuman insists there is a difference between settlement proceeds and the writ refunds received here. In his view, when clients reimbursed the firm for the advanced writ fees, they were paying a legal bill, not entrusting any funds to the firm. That is perhaps a fair description of what the clients did at one moment in time. But it is of no help to Schuman because the pertinent moment in time is when those advanced fees were refunded to the firm by the D.C. Superior Court. At that point, Schuman & Felts did hold entrusted client property in connection with a representation, as covered by Rule 1.15(a). That Schuman's clients did not expect a refund does not render the writ fees any less entrusted. *See In re Anderson*, 979 A.2d 1206, 1211, 1219 (D.C. 2009) (appended Board report) (finding misappropriation where respondent, unbeknownst to his clients, negotiated reductions of his clients' medical bills after settlement, but did not remit the savings to his clients). What matters is that Schuman's clients trusted that his firm would use their funds only as authorized: to pay for Writs of Restitution. When they did not go to that purpose and were instead refunded, the firm held—and then misappropriated—entrusted

client funds.[3]  Schuman's clients clearly did not authorize using their payments (of purported fees that were ultimately refunded) to line the firm's pockets and pay for its unrelated business expenses.

Schuman persists that his conduct did not amount to misappropriation because his retention of the writ refunds is analogous to that of an attorney double billing or overbilling a client which, he contends, is not chargeable as misappropriation.  We reject that argument for two reasons.

---

[3] This also aligns with our court's recent exposition on the meaning of "entrusted funds."  As we explained in *In re Harris-Lindsey*, the "entrustment of funds has to do with giving funds over to the care of an attorney with confidence that the funds will be as safe as they would be if the client were to continue to hold them." 242 A.3d at 622.  Such was the case here: Schuman's clients reimbursed his firm for advancement of a court fee, believing their money would be handled as safely as if they had paid the fee themselves—including a return of those funds in the event an eviction never occurred.  In *In re Harris-Lindsey* we exercised some leniency, giving only prospective force to our new articulation of what it means for funds to be entrusted.  *Id.* at 617, 624.  Because that was the first time we had articulated "what it means for client or third party funds to be 'entrusted' to a lawyer and expand[ed] our application of the term 'unauthorized use' for purposes of determining whether funds have been misappropriated," we "decline[d] to sanction respondent for misappropriation" given the novelty of our pronouncement. *Id.* at 624–25.  There is no similar cause for leniency here.  Schuman was sufficiently on notice that his conduct amounted to misappropriation given this court's previous decisions regarding the mishandling of settlement proceeds.  And, unlike the issue presented in *In re Harris-Lindsey*, 242 A.3d at 624–25, prior guidance from this court and the Board is not contrary to the outcome reached today.

First, its premise is questionable, as we are unaware of any case where we have held that double billing or overbilling cannot amount to misappropriation, at least not as a categorical matter.[4] In *In re Cleaver-Bascombe*, we said that submitting a falsified voucher under the Criminal Justice Act—seeking payment for services not from a client but from the court—did "not involve misappropriation of *client* funds" despite the "obvious similarities between the two situations." 892 A.2d 396, 412 n.15 (D.C. 2006) (emphasis in original). But if anything, that we chose to emphasize the word *client* in that declaration suggests we thought the only thing keeping the conduct from being misappropriation was that the attorney bilked the public fisc rather than a client. Lacking in controlling precedents, Schuman places undue reliance on Disciplinary Counsel's practice of typically charging such cases as a violation of Rule 8.4(c) for dishonest conduct, rather than for misappropriation. Disciplinary Counsel's charging decisions have little legal bearing on the question before us. Those charging decisions may reflect nothing more than the practical reality that it is often easier to prove dishonest conduct than it is to prove misappropriation. For instance, misappropriation generally requires Disciplinary

---

[4] It might depend on what, exactly, the attorney is overbilling for. It is perhaps a stretch to say that attorneys who inflate their contracted-for rates thereby make "any unauthorized use of client's funds." *In re Ekekwe-Kauffman*, 210 A.3d at 792 (defining misappropriation). But it is not such a stretch to say an attorney who overbills for particular expenses incurred and then pockets the overage and uses it for personal expenses has done so. We ultimately do not confront that question.

Counsel to prove that the account holding the client's funds dropped below the amount owed to the client, *In re Ekekwe-Kauffman*, 210 A.3d at 792–94, an element not required to prove dishonest conduct, *see id.* at 795. That Disciplinary Counsel tends not to charge violations of Rule 1.15(a) when an attorney double bills or overbills a client does not establish that it could not do so in an appropriate case.

Second, even if we were to accept its premise as true, the analogy still fails. If Schuman had simply billed clients for the same Writ of Restitution twice, having only paid for them once, then it is possible we might say he procured the client funds through dishonesty, but made no unauthorized use of entrusted funds. Assuming that is true—and it is far from clear—here we have the opposite situation. There was nothing dishonest in Schuman's procurement of the client funds; there is no dispute that his firm advanced the fees for the writs and properly billed clients for reimbursement. The impropriety came in how Schuman chose to dispose of those funds: not to pay for Writs of Restitution, ultimately (in light of the refunds), but for his firm's business expenses. That is classic misappropriation. We attach no significance to the fact that the funds were once used precisely as authorized for Writs of Restitution. Once the amounts were refunded, they were client funds entrusted to Schuman and he misappropriated them.

Having determined that the writ refunds were subject to Rule 1.15(a), we adopt the Board's findings that Disciplinary Counsel proved by clear and convincing evidence that Schuman commingled and intentionally misappropriated entrusted client funds. Schuman engaged in commingling when he deposited the writ refunds into his firm's operating account rather than into a separate account. *See In re Ekekwe-Kauffman*, 210 A.3d at 792 ("To guard against the loss of clients' money, Rule 1.15(a) . . . requires a lawyer to hold client funds in a separate trust account and to avoid commingling [his] clients' funds with [his] own property."). He then misappropriated client funds by using the writ refunds—without client approval—to pay Schuman & Felts's expenses, causing the balance in the firm's operating account to drop below the amount due to his clients. *See id.* at 792–94. The misappropriation was intentional, as clearly evidenced by Schuman's conscious decision to reimburse current clients but not former clients, a distinction he could not credibly explain.[5]

---

[5] On February 18, 2020, Schuman filed a motion for partial summary affirmance on the ground that his conduct, as a matter of law, did not amount to misappropriation. In light of our finding otherwise, the motion is denied.

*B. Rule 1.15(a) (Record Keeping)*

The Board found that Schuman violated Rule 1.15(a)'s record keeping requirements when he failed to account for the disposition of $34,391 worth of writ refunds deposited into Schuman & Felts's operating account. Schuman challenges the Board's finding on two grounds: first, the writ refunds were not entrusted client funds, and second, Disciplinary Counsel "never complained that [Schuman] did not provide enough information to satisfy its inquiry" regarding the unaccounted for writ refunds.

The first contention fails for the reasons articulated above, in Part II.A. The second is without merit because Disciplinary Counsel requested all billing statements issued to Schuman's clients "whose writ refunds [were] deposited into the firm's operating account from January 2013 through April 2014," as well as an analysis of any writ refunds that were applied as credits to clients' outstanding bills. In other words, Disciplinary Counsel asked for a full accounting of the $58,820 worth of writ refunds that were deposited into Schuman & Felts's operating account

but not refunded to clients in March 2014. Schuman's failure to respond fully is of his own doing, not a lack of clarity or diligence on the part of Disciplinary Counsel.[6]

Given the above, we agree with the Board that Disciplinary Counsel proved by clear and convincing evidence that Schuman violated Rule 1.15(a)'s requirement that an attorney maintain complete records of all client funds in his possession when he failed to provide documentary records accounting for $34,391 of the writ refunds deposited into Schuman & Felts's operating account.

## C. Rule 1.15(c) (Prompt Notification and Delivery)

The Board found that Schuman violated Rule 1.15(c)'s instruction that attorneys "promptly notify [a] client or third person" "[u]pon receiving funds or other property in which a client or third person has an interest," and "promptly deliver to the client or third person any funds or other property that the client or third

---

[6] Schuman suggests in passing that he satisfied Disciplinary Counsel's request for a full accounting based on his belief that his staff forwarded all writ refunds to Schuman & Felts's clients. He is wrong. A belief that funds were handled in a certain way that is unsubstantiated by documentary evidence is insufficient to satisfy Rule 1.15(a)'s record keeping requirements. *See In re Dailey*, 230 A.3d 902, 913 (D.C. 2020) (stating that "[t]he purpose of Rule 1.15(a) is to ensure that *the documentary record itself* tells the full story of how the attorney handled client or third-party funds") (emphasis added and internal quotation marks omitted).

person is entitled to receive." D.C. R. of Prof. Conduct 1.15(c). Schuman takes exception to this finding, claiming that Disciplinary Counsel did not carry its burden of proof. Yet he offers no argument in support beyond the aforementioned threshold premise that the writ refunds were not client property entrusted to Schuman & Felts. Having rejected that premise, we agree with the Board that Disciplinary Counsel carried its burden in proving by clear and convincing evidence that Schuman violated Rule 1.15(c) when he failed to promptly notify his former clients for a year or more regarding his receipt of the writ refunds. *Cf. In re Ross*, 658 A.2d 209, 211 (D.C. 1995) (finding "eleven-month delay was not prompt").

## D. Rule 8.4(c) (Dishonesty)

Finally, the Board determined that Schuman engaged in dishonest conduct in violation of Rule 8.4(c) in two separate respects: "he withheld writ refunds from his former clients" and "he made false statements in emails to Mr. Cole about refunds due to a former client" of Schuman & Felts. Schuman argues, first, that Disciplinary Counsel did not prove by clear and convincing evidence that he acted with dishonest intent by withholding the writ refunds, and second, that the Board's factual findings about his interactions with Cole were not supported by substantial evidence. We take these arguments in turn.

i. Retaining and spending former clients' writ refunds

According to Schuman, he did not act with dishonest intent when he retained his former clients' writ refunds and then subsequently used the funds to pay his firm's expenses because he "made a mistake" and "did not fraudulently induce clients to make unearned payments." To begin, fraudulent inducement is not necessary to establish dishonest intent. *In re Romansky*, 825 A.2d 311, 315 (D.C. 2003) ("[D]ishonesty does not always depend on a finding of intent to defraud or deceive.") (quoting *In re Estate of Corriea*, 719 A.2d 1234, 1242 (D.C. 1998)). The fact that Schuman was a passive recipient of refunds that he wrongly retained, as opposed to actively soliciting the money through fraud, does not preclude the Board from determining he acted dishonestly. Perhaps it lessens his moral culpability in the way one might think a person who finds and keeps another's wallet—even if they know the owner and where they might return it—is not as abject as the pickpocket. But his conduct was dishonest no less.

As to Schuman's assertion of mistake, we again agree with the Hearing Committee and the Board: Schuman's decision to keep writ refunds belonging to former clients, while forwarding those belonging to current clients, evidenced not a mistake, but a conscious decision amounting to intentional dishonest conduct in

violation of Rule 8.4(c). *See In re Romansky*, 825 A.2d at 315 (stating that "[o]ur case law has consistently found that when . . . an action is obviously wrongful and intentionally done, the performing of the act itself is sufficient to show the requisite intent for a violation").

## ii. Statements to Cole

The Board found that Schuman acted dishonestly when he falsely misrepresented to Cole that Schuman & Felts had endorsed and forwarded writ refund checks to WDC-1. Schuman argues this finding was not supported by substantial evidence because the Board's reasoning was based, in part, on a misplaced belief that the Hearing Committee credited the testimony of Katherine Parker, a prior staff member of Schuman & Felts, over that of Schuman.[7] Schuman is correct that no such credibility determination was made and the Board was mistaken to say otherwise. The Hearing Committee merely noted that Schuman's and Parker's respective testimonies were at odds, without explicitly crediting one over the other. But the Board's error is of no moment. As Disciplinary Counsel

---

[7] Schuman also notes an alleged factual misstatement made by the Hearing Committee. Even if he is correct, there is no indication that the Board relied on this alleged misstatement in rendering its findings.

correctly notes, the Board did not rely only on the tension between Schuman's and Parker's testimonies when reaching its finding, and the other evidence it relied upon independently supports its finding of this Rule 8.4(c) violation.

At the time he communicated with Cole, Schuman was aware that his firm forwarded writ refund checks only to current clients. He was also aware that WDC-1 was a former client. Based on these two uncontested facts alone, the Board was right to find that Schuman's representations were, at a minimum, recklessly dishonest.[8] Any purported mistaken reliance on his staff—which the Board could, in any event, rightfully view with wariness given Parker's testimony that she was never asked about the WDC-1 refunds—does not afford Schuman a free pass. Even assuming Schuman was told by Parker that "anything that came in for WDC-1 should have gone to them," he should have known that was not true. He knew writ refunds were not sent to former clients and that WDC-1 belonged in that category.

Like the Hearing Committee, we do not mean "to impose on the members of the Bar a strict ethical requirement that honesty apply to every possible incidental

---

[8] Dishonesty can be established by sufficient proof of recklessness—i.e., proof that Schuman "consciously disregarded the risk" created by his actions. *In Re Romansky*, 825 A.2d at 317.

conversation or email with a fellow lawyer, whether one competing for clients or an adversary in court." But this was no white lie. A former client wanted their refund, improperly retained by Schuman, and Schuman chose to double down on his ruse rather than admitting that he had kept their refund checks. He was neither competing nor advocating for a client when he made false representations to Cole; he was thwarting Cole's attempts to recover money that rightly belonged to Schuman & Felts's former client.

Based on the foregoing record, we agree that Disciplinary Counsel established by clear and convincing evidence that Schuman acted dishonestly during his interactions with Cole in violation of Rule 8.4(c).

## III.

We next turn to the Board's recommendation that Schuman be disbarred. Disbarment is the presumptive sanction for intentional misappropriation. *In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc). Schuman asserts that he overcame that presumption and demonstrated "extraordinary circumstances" so that the Board should have mitigated his punishment. *Id.* In his view, he satisfied the three-prong mitigation test we outlined in *In re Kersey*, 520 A.2d 321 (D.C. 1987). "In order to qualify for a reduced sanction under the *Kersey* doctrine," an attorney

must demonstrate "(1) by clear and convincing evidence that he had a disability; (2) by a preponderance of the evidence that the disability substantially affected his misconduct; and (3) by clear and convincing evidence that he has been substantially rehabilitated." *In re Lopes*, 770 A.2d 561, 567 (D.C. 2001).

There is no dispute that Schuman suffered from depression at the time of his misconduct. But the Board concluded that Schuman was not entitled to *Kersey* mitigation because (1) his depression was under control so that it was not disabling under *Kersey*'s first prong, and (2) for the same reason—that his depression was under control at the time of his misconduct—Schuman could not demonstrate that his depression substantially affected his misconduct under *Kersey*'s second prong. We first recount the evidence presented to the Hearing Committee related to this *Kersey* defense. We then address whether it mitigates his presumed disbarment. We agree with the Board that Schuman did not satisfy *Kersey*'s second prong and conclude that mitigation is not appropriate here. We therefore disbar Schuman from the practice of law in the District of Columbia.

*A. The Record on Mitigation*

In support of his *Kersey* defense, Schuman offered testimony from Dr. Nuha Abudabbeh, a clinical and forensic psychologist. Dr. Abudabbeh was retained solely

for litigation and did not know Schuman during the timeframe in which the misconduct occurred. But she interviewed Schuman on multiple occasions in 2018 and reviewed various records, including (i) an evaluation report dated November 26, 2012, performed by Dr. Jennifer Coughlin at the Johns Hopkins Department of Psychiatry; (ii) notes from Schuman's treating psychiatrist, Dr. Lauren Hodas, from 2012-2014; (iii) a 2017 letter from Dr. John R. Lion, a clinical professor of psychiatry at the University of Maryland; and (iv) a 2017 letter from Denise Perme, a licensed clinical social worker at the D.C. Bar Lawyer Assistance Program. We briefly recount these records below.

Dr. Coughlin's 2012 evaluation indicated that Schuman had a "long personal history of recurrent major depressive episodes" and diagnosed him with "[m]ajor depressive disorder." Not long after Dr. Coughlin's evaluation was conducted, Schuman began receiving treatment from a psychiatrist, Dr. Hodas. Dr. Hodas's notes from late 2012 outlined the symptoms of Schuman's major depressive disorder, which included "paralyzing terror," having a "deer in the headlights" feeling, heart palpitations, and wanting to "always be in bed." After Schuman altered his medications, his mental condition appeared to improve by January of 2013, when he began receiving the writ refunds: Dr. Hodas noted that Schuman was "sleeping well," no longer had a "deer in the headlight feeling," and was not

"obsessing & worrying constantly." The Board summarized the remainder of Dr. Hodas's treatment notes through March 2014 (i.e., the time period between Schuman's decision to retain writ refunds belonging to his former clients and his decision to return said refunds) as generally showing continued "mental improvement" and that Schuman "reported more energy, less worry, and more optimism."

Dr. Lion, who reviewed materials related to Schuman's misconduct and interviewed Schuman on several occasions in late 2017, opined that Schuman "suffered from a Major Depressive Disorder during the time of his alleged misconduct" and that his "depressive condition was the cause of [his] misconduct and substantially affected it." Denise Perme, who also reviewed materials and conducted interviews in 2017, opined that "Schuman met the . . . symptom criteria for Major Depressive Disorder," and emphasized that although Dr. Hodas's notes seemed to "indicate that Mr. Schuman verbalized some improvement," that did "not mean that Mr. Schuman was asymptomatic or functioning well in general during that time period." She concluded that "[b]ut for the Major Depressive Disorder . . . Mr. Schuman would not have allowed the deposit of the subject court refunds to the firm's operating account" and that his depression "greatly affected his ability to think about, and decide how to respond, when refund checks began arriving to the office."

Based largely on the above medical records, Dr. Abudabbeh testified that Schuman was "suffering from a major depressive disorder" when he began receiving writ refunds from the D.C. Superior Court in January 2013. When asked if Schuman's depression affected his mishandling of the writ refunds, Dr. Abudabbeh testified that she thought "there was a connection" and that although Schuman "may have been in . . . 'partial remission' from the major depressive disorder, there may have been remnants of that depression that might have affected [him] at that time."

To rebut the *Kersey* defense, Disciplinary Counsel offered an expert report and testimony from Dr. Philip Candilis. Dr. Candilis acknowledged that Schuman had a history of depression. Based on his interview with Schuman and an evaluation of the relevant medical records, however, Dr. Candilis opined that Schuman was not disabled by his depression. His conclusion was based, in part, on Schuman's ability to handle personal and professional matters, such as "maintaining his schedules, his deadlines, his cases; . . . meeting payroll, having meetings with staff; [being involved] in the day-to-day activities of a busy law firm[;]" and buying a new home. If Schuman was disabled by his depression, Dr. Candilis opined that it "would [have been] evident in other parts of his life," not just in his handling of the writ refunds. Dr. Candilis also noted in his expert report that Schuman's visits with Dr. Hodas diminished during his time of misconduct and that "[t]here were no documented

phone calls or crises" emblematic of a patient with an "acute debilitating illness." For all the same reasons, Dr. Candilis opined that Schuman's depression did not cause his misconduct.

*B. Schuman's Depression Did Not Substantially Affect His Misconduct*

A sanction for intentional misappropriation short of disbarment may be appropriate if an attorney suffered from depression that substantially affected their misconduct and they are now rehabilitated. *See In re Peek*, 565 A.2d 627, 633 (D.C. 1989); *Kersey*, 520 A.2d at 327. "[I]t is not enough to say the [attorney suffers from a disability] and *ipso facto* causation is proven." *Kersey*, 520 A.2d at 325. The attorney must show that "but for [his disabling condition], his misconduct would not have occurred." *In re Zakroff*, 934 A.2d 409, 423 (D.C. 2007) (quoting *Kersey*, 520 A.2d at 327) (alterations in original).

Both the Hearing Committee and the Board found that Schuman did not prove by a preponderance of the evidence that his depression substantially affected his misconduct.[9] There were two primary reasons for the Hearing Committee's

_____

[9] The Board also found that Schuman failed to establish he was suffering from a disability at the time of his misconduct (the first prong of *Kersey*) based on the contemporaneous notes from Dr. Hodas suggesting Schuman's depression was

determination on this point: First, besides his misconduct, Schuman did not identify any area of his personal or professional life that was adversely affected by his depression, which "strongly suggest[ed] that [Schuman's] disability claim was one of convenience rather than the impact of an acknowledged illness." Second, the Hearing Committee credited the testimony and report of Disciplinary Counsel's expert, Dr. Candilis, over that of Schuman's expert, Dr. Abudabbeh. More specifically, the Hearing Committee found Dr. Candilis's logic and analysis "far more persuasive than a simple formula 'depression equals disability' with implied causation," which appeared to be the methodology used by Dr. Abuddabeh. On review, the Board adopted and incorporated the Hearing Committee's reasoning, but added that Dr. Hodas's contemporaneous notes reported improvements in Schuman's depression throughout his course of misconduct, which "significantly cut against any causation argument."

Schuman offers two counterpoints. First, he asserts the Board misapplied *Kersey* by requiring him to demonstrate that his depression affected other areas of

---

improved at the time he began receiving the writ refunds from D.C. Superior Court. The Hearing Committee disagreed, finding that Schuman's allegedly improved condition was a consideration for determining causation (the second prong of *Kersey*), not for determining whether he was suffering from a disability. We take no position on that disagreement because, in any event, Schuman was not entitled to mitigation because he did not carry his burden of demonstrating causation.

his life, rather than just the misconduct amounting to the charged rule violations. But the Board did no such thing. This was just one factor—a mere piece of evidence—that the Board considered when determining that Schuman's depression did not substantially affect his misconduct. And it is a perfectly reasonable factor to consider. After all, if depression had driven Schuman to this extreme, protracted, and self-serving misconduct in his professional life, it stands to reason it would have impacted his personal and professional lives in other ways as well. *See, e.g.*, *Kersey*, 520 A.2d at 324 (noting broad impact alcoholism had on respondent's life beyond his legal practice); *In re Temple*, 596 A.2d 585, 590–91 (D.C. 1991) (noting broad impact of prescription drug abuse on respondent's life beyond legal practice). Evidence that his depression had a broader and more disabling impact on his life would have supported Schuman's mitigation defense, and the absence of such evidence detracted from it.

Second, Schuman asserts the Board failed to consider the totality of the evidence offered in support of his *Kersey* defense. To the contrary, the Board did not ignore relevant evidence; it simply found that the evidence presented by Disciplinary Counsel was more credible and persuasive than that offered by Schuman. For good reason. Schuman relied largely on Dr. Abudabbeh, who opined that Schuman was suffering from major depressive disorder at the time of the

misconduct but could only speculate that Schuman's depression "might have affected him" during the time period when his misconduct transpired. The supporting letters from Denise Perme and Dr. Lion—who did not testify and whose opinions were offered only as foundation for Dr. Abudabbeh's opinions[10]—concluded that Schuman's major depressive disorder was the cause of Schuman's misconduct but offered no persuasive explanation as to why. And while Dr. Coughlin's report diagnosed Schuman with major depressive disorder, it offered no opinion whatsoever as to causation.

In contrast, Disciplinary Counsel's expert, Dr. Candilis, provided a detailed report—supported by his testimony before the Hearing Committee—explaining why Schuman's depression did not substantially affect his misconduct.[11] That opinion found support in Dr. Hodas's notes taken from the time when Schuman's misconduct

---

[10] Their letters were admitted into evidence as sources of information relied upon by Dr. Abudabbeh in rendering her expert opinion.

[11] Schuman argues that Dr. Candilis should not have been qualified as an expert because he "refused to address [the *Kersey*] elements and concocted his own." But Dr. Candilis did address the *Kersey* elements—his entire testimony related to whether Schuman suffered from depression and whether his depression was a substantial cause of his misconduct. That Dr. Candilis did not use the exact terminology utilized in the case law is of no concern. Dr. Candilis was not offered as a legal expert, and to the extent he misstated a legal element or phrase, the Board was not led astray from the correct legal principles.

began, indicating that his depression had substantially improved as a result of treatment and medications.

In sum, Schuman wrongly retained and spent hundreds of thousands of dollars belonging to former clients. That he received those funds "passive[ly]," a point he ascribes great exonerating weight to, does not change that he misappropriated those funds. And he did not demonstrate that his misconduct was substantially affected by his depression. We agree with the Board that the most compelling evidence on that issue was to the contrary.

**IV.**

It is therefore ORDERED that Schuman is disbarred from the practice of law in the District of Columbia. It is FURTHER ORDERED that he return the unaccounted for $34,391 to his clients if it can be traced back to them or, if it cannot, that he disgorge that amount to the D.C. Bar's Clients' Security Fund.[12] D.C. Bar R. XI, § 3(a)(1), (b). For purposes of reinstatement, we refer Schuman to the requirements under D.C. Bar R. XI, § 16(c).

---

[12] On February 18, 2020, Schuman filed a motion to lift his suspension from the practice of law pending final disposition of his appeal. In light of Schuman's disbarment, we deny that motion.

*So ordered.*